UNITED STATES of America ex rel.
Burton N. PUGACH, Petitioner,

v.

Hon. Vincent R. MANCUSI, Warden, Attica State Prison, Respondent.

Burton N. PUGACH, Plaintiff,

v.

Paul K. McGINNIS, Commissioner of Correction of the State of New York, and Vincent R. Mancusi, Warden of Attica State Prison, Defendants.

Nos. 67 Civ. 4844, 68 Civs. 2177, 3948, 69 Civs. 3633, 3634, 3635.

United States District Court, S. D. New York.

March 12, 1970.

Burton N. Pugach, pro se, petitioner.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for respondent, by Joel Lewittes, Asst. Atty. Gen., and David S. Blatt, Asst. Dist. Atty., Bronx County, of counsel.

## OPINION

POLLACK, District Judge.

Federal habeas corpus is sought herein by a state prisoner. These proceedings are the culmination of an "almost unparalleled succession of collateral attacks [by him] on his conviction both in state and federal courts".[1]

---

1. United States ex rel. Pugach v. Mancusi, 411 F.2d 177, 178 (2d Cir. 1969), cert. denied, 396 U.S. 889, 90 S.Ct. 172 (1969). Pugach has prosecuted some 26 separate proceedings or suits in the New York federal courts relating in some respect to his conviction. See Appendix to this opinion. The total includes 14 habeas applications, two libel suits, two applications to convene a three-judge court, five civil rights suits, a motion to remove a civil action from a state court to a federal court and two applications for mandamus. Of the 26 collateral attacks, six are presently pending before this Court, seven were dismissed for failure to exhaust state remedies, four were dismissed on other procedural grounds and

The matter came before this Court following a decision of the Court of Appeals for the Second Circuit reversing the denial of a hearing on petitioner's claims and remanding his petition for habeas corpus to this Court with the direction that an evidentiary hearing be held on certain of petitioner's contentions. The appellate court suggested that this petition together with others pending in the Southern and Western Districts of New York be placed in one bundle and be referred to one Judge to avoid undue drain on judicial time. Furthermore, the court said: "We also place Pugach on notice that if he has still other federal claims, these must be promptly asserted along with the ones now pending." 411 F.2d at 181.

The determination of the Court of Appeals referred to furnishes the following succinct statement of the background for all the pending matters:

Appellant Pugach, a lawyer, was indicted in 1959 by a New York grand jury for a number of crimes arising out of an alleged conspiracy whereby, using Al Smith Newkirk as an intermediary, he hired Heard Harden and Walter McMillian to maim his former girl friend, Linda Riss, by hurling lye in her face. McMillian and Newkirk pleaded guilty. Pugach and Harden stood trial and were convicted. Pugach was sentenced in 1962 for an aggregate of 15 to 30 years in prison. His conviction was affirmed by the Appellate Division, People v. Pugach, 21 A.D.2d 854, 251 N.Y.S.2d 1007 (1st Dept. 1964) and by the Court of Appeals, 16 N.Y.2d 504, 260 N.Y.S. 2d 444, and the Supreme court dismiss-

ed his appeal for want of a substantial federal question, 373 U.S. 575, 86 S.Ct. 1077, 16 L.Ed.2d 108 (1966). [411 F.2d 177, 178.]

Accordingly, the cases presented to this Court consist of five petitions for a writ of habeas corpus as well as one Civil Rights action brought under Title 42 U.S.C. § 1983. Three of these petitions were originally filed in the Southern District of New York.[2] The other three cases were filed in the Western District of New York and following the suggestion of the Court of Appeals mentioned above, were transferred to this Court.[2a]

## PRIOR ADJUDICATION

On July 30, 1969, at the direction of the Court and pursuant to the admonition of the Court of Appeals that petitioner must promptly assert any other federal claims he wishes to raise along with the ones now pending, United States ex rel. Pugach v. Mancusi, 411 F.2d 177, 181 (2d Cir. 1969), cert. denied 396 U.S. 889, 90 S.Ct. 172, 24 L.Ed.2d 163 (1969) petitioner executed a notice of election of claims listing the following bases for relief:

Petitioner claims (1) that evidence was used against him which was obtained as the tainted fruit of trespassory eavesdropping, carried out under a defective warrant; (2) that statements and acts of his, coerced by police agents through blackmail and fraud, were used against him at trial; (3) that the victim of his alleged assault and others testified against him perjuriously while the prosecutor concealed conflicting state-

---

nine were determined on the merits. Of the nine, one related to a prior conviction on a Sullivan Act violation, two concerned irregularities in warrants of his commitment, two challenged denials of access to the courts, two were attempts to mandamus federal district courts, one was tantamount to a discovery motion, and one concerned a set of habeas applications going to the heart of petitioner's contentions herein. The last action was United States ex rel. Pugach v. Wil-

kins, Civil No. 11,004 (W.D.N.Y. Dec. 11, 1964, per Burke, J.), application to vacate denied, (W.D.N.Y. Feb. 8, 1965).

2. Docket Nos. 67 Civ. 4844; 68 Civ. 2177; 68 Civ. 3948. (All petitions for habeas relief).

2a. Docket Nos. 69 Civ. 3633 (Civil Rights suit commenced Nov. 18, 1968); 69 Civ. 3634 (habeas petition); 69 Civ. 3635 (habeas petition).

ments made previously by these witnesses; (4) that he was denied the right to act as his own counsel after his retained counsel was temporarily relieved; and (5) that his trial counsel was incompetent.

Petitioner sought to supplement his election by a petition sworn to October 6, 1969, in which he included the claim that he was deprived of his Sixth Amendment right to confrontation and effective cross-examination by the admission during his trial of the confession of a co-defendant which incriminated him. The requested addition was accepted by the Court at a pre-hearing conference on November 7, 1969, at which petitioner acknowledged that the six claims represented all the federal grounds for relief which he had with respect of his conviction. In preparation for the determination of the issues herein, the court conducted a painstaking investigation of the steps taken by Mr. Pugach in this and in the Western District of New York, since his conviction. This brought to light the fact that all six claims asserted herein were adjudicated on the merits and habeas petitions thereon were denied, in at least one previous final federal district court determination. No appeals therefrom were taken by Mr. Pugach.

The prior determination of these claims is embodied in the order dated December 11, 1964, of Judge Harold P. Burke of the United States District Court for the Western District of New York, which denied six separate habeas petitions and supplementary applications. The petitions were all of the 1964 vintage, dated April 14 and 24, May 4, June 16 and 22, and July 29, respectively. They were denied without an evidentiary hearing upon Judge Burke's specific finding of fact [no. 12] that an examination of the trial record, the record of post-trial proceedings, and the briefs on appeal in the Appellate Division of the New York Supreme Court was sufficient and adequate for a deter-

mination of all questions presented. United States ex rel. Pugach v. Wilkins, Civ.No. 11,004 at 9 (W.D.N.Y. Dec. 11, 1964) [hereinafter cited as *Wilkins*].

Relevant to Pugach's claims in his election of July 30, 1969, are the following findings of Judge Burke: Re (1) —"no basis for his [Pugach's] claim that he was denied due process of law by the illegal use of eavesdrop evidence," *Wilkins*, at 10; re (2) —"no basis for his claim that he was denied due process of law by the admission in evidence of acts and declarations of petitioner resulting from acts of extortion and threats of the district attorney and the police," *Wilkins*, at 10; re (3) —"no basis for his claim that he was denied due process by the willful use of perjured testimony," *Wilkins* at 10; re (4) —"no basis for his claim that he was denied due process in what he calls the court's refusal to allow him to defend himself," *Wilkins*, at 9; and re (5) —"The petitioner was represented at the trial by two attorneys who were able and competent." *Wilkins*, at 9.

Bearing on Pugach's additional claim asserted in his supplementary petition of October 6, 1969, is Judge Burke's finding that there is "no basis for his claim that he was denied due process of law by the instruction to the jury that out-of-court statements made by a co-defendant, not in the presence of petitioner, are evidence against the petitioner," and the finding that there is "no basis for his claim that he was denied due process of law by the admission of evidence unconnected to the petitioner." *Wilkins*, at 10.

The apparent oversight by the Court of Appeals of these adverse determinations from which no appeal was taken underscores the advisability of the movement under way to install a central registry for all post-conviction applications made by a defendant, which would be indexed under a number assigned to

each individual at the time of conviction.[3]

█ While traditional notions of *res judicata* do not literally apply to petitions for habeas corpus, Sanders v. United States, 373 U.S. 1, 8, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Smith v. Yeager, 393 U.S. 122, 124–125, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968), the courts and Congress nevertheless have long recognized that under appropriate circumstances, successive applications for the same relief need not be entertained. See, *e. g.*, Salinger v. Loisel, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989 (1924), and cases cited in Sanders v. United States, *supra*; 28 U.S.C. § 2244. Under subsection (a) of § 2244, a District Judge is not required to entertain an application for a writ of habeas corpus if

> it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus and the petition presents no new ground not theretofore presented and determined, and the judge or court is satisfied that the ends of justice will not be served by such inquiry.

The Supreme Court has spelled out the statutory standard for declining to consider successive applications on grounds previously heard and determined:

> Controlling weight may be given to denial of a prior application for federal habeas corpus * * * relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application. Sanders v. United States, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077 (1963).

The Supreme Court, furthermore, said that by the "same ground" it meant the same "sufficient legal basis for granting the relief sought by the applicant," even if new factual allegations were used to raise the old ground. *Sanders*, at 16, 83 S.Ct. at 1077. By an adjudication on the merits, the Supreme Court signified either the prior holding of an evidentiary hearing or the conclusive resolution of factual issues raised in prior applications on the files and records therein. Id. The Supreme Court indicated that the "ends of justice" would normally be

---

3. A joint committee of federal and New York State court judges acting under the aegis of the Administrative Board of the Judicial Conference of New York State, is considering the creation of a central computer index for habeas corpus and other post-conviction applications. For positive identification of applicants, the project contemplates the use of an inmate's "NYSIIS" number, which would be added to each application by the State Department of Correction.

The goals are "to enable the Judicial Conference to act as a speedy and reliable central reference agency (1) to advise any state or federal judge to whom a post-conviction application is made of that prisoner's previous and pending post-conviction applications and the key-data in such other applications, and (2) to learn from each judge to whom a post-conviction application is made (a) the key-data on it when it is filed, and (b) the disposition of it. The hope is that

the repetitious applications, which appear to form a large part of the total of such applications, can be brought under a better coordinated review, duplications or needless appointments of counsel avoided, and material relevant . . . to disposition unearthed." Dooling, J. Memo Re Central Reference System for All Prisoner Post-Conviction Applications, October 15, 1969.

The United States District Court for the Northern District of New York has posted a notice, dated July 27, 1965, in all state prisons within the district which directs that petitions "set forth the name and location of any and all Courts, State and Federal, in which the petitioner has filed previous petitions, motions or applications with respect to the challenged conviction, the specific nature and disposition thereof, the date of disposition and (if known) citations of any written opinions and orders".

served by a prior determination on the merits except in the following cases:

If factual issues are involved, the applicant is entitled to a new hearing upon showing that the evidentiary hearing on the prior application was not full and fair; we canvassed the criteria of a full and fair evidentiary hearing recently in Townsend v. Sain, *supra* [372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)], and that discussion need not be repeated here. If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application. Sanders v. United States, 373 U.S. 1, 16–17, 83 S.Ct. 1068, 1078 (1963).

The Supreme Court, in *Sanders,* also held that the burden is on the petitioner to show that the ends of justice would be served by a redetermination of a ground previously decided against him on the merits. Furthermore, the Court of Appeals has recently held it an abuse of discretion to entertain a subsequent petition for habeas on a previously determined ground, under the rubric of the "ends of justice", where the facts were adequately developed in a previous application, no change of law has occurred, and the petitioner did no more than "express the opinion that the prior decision of this court was incorrect." United States ex rel. Schnitzler v. Follette, 406 F.2d 319 (2d Cir. 1968), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969).

■ An examination of the petitions before Judge Burke and the petitions before this Court underlying Mr. Pugach's recent election of claims and the supplement thereto makes it clear that the same legal bases for relief were relied on, and hence the "grounds" are identical. Sanders v. United States, 373 U.S. 1, 16, 83 S.Ct. 1068 (1963). Furthermore, since Judge Burke denied an evi-

dentiary hearing on the specific finding that the "files and records conclusively resolved" the factual issues, *Sanders, supra,* at 16, 83 S.Ct. 1068, the adjudication was on the merits.

Moreover, the Court is convinced that Judge Burke's denial of an evidentiary hearing on the previous applications was consonant with the Supreme Court's standards enumerated in Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 700 (1963), and that petitioner has failed either to make new factual allegations which entitle him to a hearing or to show an intervening change of law which substantially affects the disposition of his claims. The "ends of justice" neither require nor are they served by entertaining Mr. Pugach's present habeas applications. These may be dismissed appropriately and solely on the strength of Judge Burke's prior adjudication thereon.

Nevertheless, mindful of the considerable energies expended by all concerned herein and in spite of the Court's opinion that so doing is an unnecessary and possibly an inappropriate legal exercise, in the interest of closing any gaps that might be held to exist, the Court elects to again test each of Pugach's claims on the evidentiary bases presented in the hearings.

## PRELIMINARY

Prior to the commencement of the hearings herein, the petitioner declined an assignment of counsel. He assured the Court that he understood the nature and extent of the proceedings, was capable of representing himself adequately, and moreover, would have available to him, continuously, the advice of Mr. Paul Vladimir, a practising attorney, personal friend and fellow law school alumnus, whom Pugach planned to consult. The petitioner assured the Court that he would not change his mind and would not during the proceedings, request an assignment of counsel. He also declined any other form of assistance

other than aid in the production of records and the service of subpoenas on witnesses. The records and witnesses desired were made available.

A meeting preliminary to the hearing canvassed the agenda to be followed and a convenient date for the start of the hearing was then agreed upon.

The hearings commenced on November 24, 1969, and were concluded on December 1, 1969. The petitioner called twelve witnesses including himself and adduced some thirty exhibits. The transcript of the 13 week trial in the state court was made part of the record and was used extensively by the petitioner in questioning certain witnesses.

The State relied solely on the direct and cross-examinations of the witnesses called by the petitioner.

After the Court had studied the record, the parties were given the opportunity to argue the points of law involved.

The claims asserted in the petitioner's notice of election (amended), will now be considered, *seriatim*.

## I. EAVESDROPPING CLAIMS

Petitioner has contended that the state's use of evidence obtained through eavesdropping infringed his Fourth and Fifth Amendment rights in various respects. He claims that the orders to plant microphones in his law office [4] were obtained by the police without probable cause and were, therefore, violative of the Fourth Amendment; that even if orally apprised of facts constituting probable cause, the failure of the judges to make a record of such facts invalidated the orders; that the orders lacked requisite particularity in failing to designate which persons' conversations [and which conversations] were to be seized; and that the orders permitted eavesdropping for an unreasonable duration. Furthermore, petitioner contends that the eavesdropping was for the purpose of obtaining admissions from him in violation of his Fifth Amendment rights.

The respondent admits that the affidavits which Lieutenant Frank Weldon submitted in support of his application for the warrants failed to set forth sufficient facts comprising probable cause.[5]

4. Three such orders were obtained: one issued on June 25, 1959, by Bronx County Court Judge Eugene G. Schultz; a second issued on August 17, 1959, again by Judge Schultz; and a third issued on October 23, 1959, by former Bronx County Judge Edward T. McCaffrey. Each order provided that the New York police force be permitted "to overhear and/or record conversations or discussions by means of an instrument in Room No. 812, in premises No. 349 East 149th Street, Bronx County, for a period of two months," and that the orders be impounded and no inspection thereof be permitted without court order.

The affidavit supporting each order was signed by Lieutenant Frank E. Weldon, who was then in command of the 42nd Detective Squad, Bronx County, and alleged

That the Police Department of the City of New York is conducting an investigation into the crimes of Maiming and Felonious Assault, recently committed in Bronx County.

Your deponent has come into possession of certain confidential information

which causes him to believe that persons with the knowledge of the aforesaid crimes are communicating, conversing and discussing these crimes in Room No. 812, in premises No. 349 East 149th Street, Bronx County.

The affidavit provided no further information concerning either the undisclosed informant or the reliability of the information. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and cases there cited.

5. The Second Circuit Court of Appeals ruled that the State might show that the judge who issued the orders had other sufficient information not recited in the affidavit:

"Since the State does not seek to sustain the sufficiency of the affidavit, which both Judge Foley, United States ex rel. Pugach v. Herold, 212 F.Supp. 828 (N.D. N.Y.1962) and Judge Bonsal, unreported, S.D.N.Y., 67 Civ. 365, April 12, 1967, have condemned, Pugach is entitled to a hearing at which the State may show, if it can, that the judge had other sufficient information before him either when the

The State Attorney General argues, however, that the requisite facts were orally placed before the judges who issued the orders in the form of sworn information supplied by Lieutenant Weldon and Detective Nicholas Savino, (the latter was a witness before this Court at the hearings held herein). Moreover, the respondent maintains that the oral information which was before the magistrate who issued an eavesdropping order is admissible regardless of whether the magistrate made a record of the information. Furthermore, the State Attorney General contends that even if there were no probable cause to support the eavesdropping, the admission of statements at trial overheard through the use of the "bugs" was, at most, harmless error.

### (a) Probable cause to issue eavesdropping orders

Both Judge Schultz, the magistrate who issued the first two eavesdropping orders, and the affiant who applied for the orders, Lieutenant Weldon, are deceased. Justice McCaffrey [formerly Judge McCaffrey] was called as a witness by petitioner and testified that he did not recall the application for the order which he issued on October 23, 1959, and that it was his general practice to interview an affiant only as to the truth of the facts set forth in his affidavits. However, Justice McCaffrey also testified that it was not uncommon for other officers to accompany an affiant, and that occasionally they were also examined.

Detective Nicholas Savino testified that he had accompanied Lieutenant Weldon when each of the three applications was made and that on each occasion the two officers were taken to the Judge's Chambers and placed under oath.

On June 25, 1959, according to Savino, Judge Schultz requested that he be given all the department's information regarding the Linda Riss maiming case and the

reasons the police wanted the order. Weldon or Savino then told the Judge the following:

Miss Riss had told Savino in a statement made only a day or two after the assault [on June 16, or 17, 1959] and while she was still confined to a hospital bed, that she had met and began dating the petitioner in 1957. She subsequently broke off her relationship with Mr. Pugach in the latter part of that year when she learned from an attorney that petitioner was still married and that the divorce papers which he showed her were fraudulent or forged. Petitioner and Miss Riss resumed their relationship after Pugach promised to obtain a genuine divorce, and the couple saw each other until 1958, when their dating was again disrupted.

Miss Riss had also told Detective Savino that petitioner began calling her at home, attempting to arrange to see her and having failed, he made threatening phone calls. She told the police that on one occasion Pugach threatened that if he could not have her, no one was to have her, and he knew people who would "take care of" her. On another occasion, petitioner, according to Miss Riss, offered her the options of either marrying him, going to bed with him and then being left alone or having the same thing happen to her that happened to Victor Reisel.

Weldon or Savino also told Judge Schultz that near the end of 1958, Miss Riss received a package of narcotics through the mail, about which the police and postal authorities had been "tipped off" by an informer. Miss Riss had claimed it was petitioner who had caused the package to be sent to her. Miss Riss obtained two criminal court summonses against Pugach, the second of which had been served. She called the police to complain that a metal object was thrown through her window, smashing it; and she attributed this offense to petitioner.

bugging was initially authorized or on the extensions of the authority." United States ex rel. Pugach v. Mancusi, 411 F.

2d 177, 180 (2d Cir. 1969), cert. denied, 396 U.S. 889, 90 S.Ct. 172, 24 L.Ed.2d 163 (1969).

Miss Riss also had told the police that one, Sue Eden, had phoned her and revealed that Pugach had sought Eden's assistance to locate someone who might beat up or harm Linda. Eden, according to Miss Riss, said she had found one Joe Finelle for the job, but a deal with him did not eventuate. Eden warned Linda to be careful, telling her that petitioner was dangerous and owned a weapon. Detective Savino had met with Sue Eden on the 16th or 17th of June, 1959, and she confirmed the information Miss Riss gave to the police.

All of the foregoing data was placed before Judge Schultz in connection with obtaining the first eavesdrop order of June 25, 1959.

According to Savino, when the police appeared a second time before Judge Schultz on August 17, 1959, to obtain an extension of the order, the Court asked what, if anything, had been accomplished by the eavesdropping. After both officers were again placed under oath, Weldon replied that the police had overheard conversations in which two other suspects telephoned petitioner's office and identified themselves. The officers evidently wished to continue the eavesdropping in order to obtain information concerning visits of various suspects to petitioner's office and what they might say relating to the case under investigation. Lieutenant Weldon also told Judge Schultz that the police had questioned Joe Finelle, and Finelle had verified Sue Eden's story and admitted having communicated with Pugach concerning such a proposition.

Detective Savino testified that when the police sought a second extension of the eavesdrop order on October 23, 1959, Lieutenant Weldon and Detective Savino appeared before Judge McCaffrey, and under oath one of the officers repeated substantially the same information as is set out above and added thereto a report of the progress made in securing evidence through the bugging. Weldon or Savino told the judge that all three of the other suspects in the case had been seen in and around Mr. Pugach's office during the previous two months, and two of them had had conversations with petitioner. The officers told Judge McCaffrey that two police informants had been sent to Pugach's office to elicit information and also told the judge what occurred. They further informed the judge that petitioner possessed a rifle on the premises.

The petitioner developed from Savino's testimony the fact that with the exception of having interviewed Sue Eden and Joe Finelle, Detective Savino had not personally checked out any aspect of Miss Riss' story. Savino did point out that Lieutenant Weldon, not he, was in charge of the investigation, and that many other officers were involved in verifying the facts of Miss Riss' story. Detective Savino identified the source of the Department's information that petitioner had a rifle as one, Police Patrolman Billy Price, a friend of Pugach who, on occasion, used office space in the Pugach suite.

Linda Riss, called as a witness by petitioner, corroborated Savino's testimony. She confirmed that she had related the facts to Savino and to Lieutenant Weldon just as Savino had testified.

Petitioner's own testimony denied the substance of much of the information imparted to the two judges, and specifically contradicted Miss Riss' testimony about the existence of a fraudulent divorce, the making of threats, and petitioner's complicity in either the window-breaking or narcotics mailing incidents. Mr. Pugach attempted to discredit Sue Eden as the mother of an illegitimate child and a prostitute and charged that Eden was motivated by jealousy of Miss Riss.

Furthermore, Pugach vigorously attacked Detective Savino's testimony herein as a recent fabrication and attempted to show that the officer's statements must have been perjurious. Petitioner elicited from Savino the fact that the officer did not volunteer to the Attorney General or Bronx District Attorney his

knowledge of the probable cause showing made in support of the eavesdropping orders until September 15, 1969. Mr. Pugach then established that on both September 3 and 11, 1969, the Bronx District Attorney answered "ready" to a calendar call, indicating his ability to proceed with a similar New York hearing. In that hearing the State also relied in large measure on Detective Savino's testimony to prove that a showing of probable cause had been made to obtain wiretap orders from the same judges. Moreover, the probable cause showing for the eavesdropping and wiretapping orders was virtually the same.

However, evidence elicited by the petitioner from Bronx Assistant District Attorney David S. Blatt explained that the District Attorney's office planned to go forward on aspects of the state hearing relating to prejudicial publicity. He further disclosed that the District Attorney was prepared to show that unlawful wiretapping did not taint the conviction even assuming that the underlying affidavits for the wiretapping orders were insufficient to show probable cause.

■ Assistant District Attorney Arnold Kideckel, in charge of the Appeals Bureau of the office, testified that he had learned in an April, 1969, conversation with Assistant District Attorney Alexander Scheer, the prosecutor in the Riss maiming case, that another officer besides the deceased Lieutenant Weldon had appeared before Judge Schultz to obtain the orders. Scheer, however, was unable in April to recall the other officer's identity. It was this information, apparently, which sparked the search for Detective Savino, who was then presented as a witness in both the Bronx County and these federal court hearings. It is evident that this was a late discovery of important testimony. However, this circumstance is not improbable considering that these were the first times that hearings were ordered. There is no factual basis for the petitioner's accusation that there was perjury or wilful

fabrication on the part of all these public officials and officers.

■ Having also had an opportunity to observe and evaluate the demeanor of all the witnesses on the stand, the Court finds from all the evidence that the testimony of Detective Savino and Linda Riss is credible and plausible, and rejects petitioner's testimony and conjectures. The Court finds that sufficient information was communicated by Lieutenant Weldon and Detective Savino to Judges Schultz and McCaffrey supplementing the affidavits herein to show probable cause for the issuance of the eavesdropping orders. The Court notes that whatever may be the value of the evidence as to the window-breaking and narcotics-mailing incidents, the judges who issued the eavesdropping orders were entitled to rely at least upon the victim's recitation of threats made against her by the petitioner, particularly when one of the threats—that the same thing which happened to Victor Reisel would happen to her—so closely paralleled the unusual mode of maiming. Furthermore, the magistrates were entitled to rely on the report of the conversation which Linda Riss recited as had with Sue Eden, since Miss Eden confirmed the story to Savino prior to the entry of any order. Moreover, before the entry of the second order, Mr. Finelle also confirmed the report of his involvement in the Riss matter.

■ In Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed. 2d 1040 (1967) the Supreme Court reaffirmed that "probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." Furthermore, *Berger*, established that the required belief is that a particular offense has been or is being committed. 388 U.S. at 58, 87 S.Ct. 1873. In addition, for the issuance of a valid

"search" warrant there must be probable basis for the belief that what is sought to be seized will be discovered at the premises to be searched. Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). The affiants must recount "underlying circumstances" which will enable the magistrate to make a "neutral" and "detached" inference of the existence of probable cause, United States ex rel. De Rosa v. LaVallee, 406 F.2d 807, 808 (2d Cir. 1969), cert. denied, 396 U.S. 854, 90 S.Ct. 115, 24 L.Ed. 2d 103 (1969); Aguilar v. Texas, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Ventresca, 380 U.S. 102, 108–109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). However, an affidavit or a sworn oral showing of probable cause is not to be deemed insufficient because it sets out the observations of another, rather than of the affiant, so long as a substantial basis for crediting the hearsay is presented. Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

In the instant case, the judges had a substantial basis for crediting the victim's recitation of petitioner's threats against her and his efforts to enlist Miss Eden's connivance in doing the victim harm. A sufficient recitation of the underlying circumstances was made by the two police officers under oath to give the judges a substantial basis for making neutral and detached determinations of probable cause. Probable cause existed to believe that the particular offense of maiming had been committed at the instigation, or at least with the complicity of petitioner and there was probable cause to believe that inculpatory information concerning the case would be discovered by eavesdropping upon his visitors and office.

The Court is mindful in this regard of the admonition in Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) that,

> In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*(b) Recording of probable cause shown*

 The Court agrees with respondent that the Fourth Amendment does not require that a record be kept of facts told a magistrate which constitute probable cause to issue a warrant for eavesdropping. Petitioner's reliance on Matter of Sarisohn, 21 N.Y.2d 36, 286 N.Y.S.2d 255, 233 N.E.2d 276 (1967),[6] is misplaced. That decision was explicitly premised on the amendment to § 794 of the N.Y. Code of Criminal Procedure (McKinney's Supp. 1969) added on July 1, 1962, which provides that affidavits in support of warrants "shall contain the statements and information upon which such person relies to establish sufficient grounds for the issuance of the warrant." See New York ex rel. Pugach v. Mancusi (Bronx County Sup. Ct. filed Nov. 13, 1969), N.Y. Law Journal, November 18, 1969. It may well be, as petitioner has argued, that New York was endeavoring to give effect to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in amending § 794. However, we are not governed on the constitutional issue by a determination of the New York legislature as to what administrative procedures would insure the protection of Fourth Amendment rights.

Respondent points to the Second Circuit's remand order as implied authority for the competency of evidence of un-

---

6. The doctrine of *Sarisohn* is a relatively recent development in New York and was not available at the time petitioner pressed his state appeals. See People v. McCall, 17 N.Y.2d 152, 159–160, 269 N.Y.S.2d 396, 216 N.E.2d 570 (1966),

distinguishing People v. Pugach, 16 N.Y. 2d 504, 260 N.Y.S.2d 444 (1965), app. dsmd. sub nom. Pugach v. New York, 383 U.S. 575, 86 S.Ct. 1077, 16 L.Ed. 2d 108 (1966).

recorded testimony supplied to the issuing magistrates to establish probable cause for the issuance of an eavesdrop order. See United States ex rel. Pugach v. Mancusi, 411 F.2d 177, 180 (2d Cir. 1969) 96 U.S. 889 (1969), 90 S.Ct. 172, 24 L.Ed.2d 163. Respondent also calls to the Court's attention United States ex rel. Schnitzler v. Follette, 379 F.2d 846, 848 (2d Cir. 1967), where an apparently unrecorded oral statement to the judge who issued a search warrant was deemed sufficient to supplement an affidavit insufficient on its face to show probable cause. See also, in this regard, Aguilar v. Texas, 378 U.S. 108, 109, n. 1, 84 S.Ct. 1509 (1964); Miller v. Sigler, 353 F.2d 424, 426 (8th Cir. 1965), cert. denied, 384 U.S. 980, 86 S.Ct. 1879, 16 L.Ed.2d 690 (1966). However, the Court does not rely solely on these cases, which do not confront the issue squarely.

In Gillespie v. United States, 368 F.2d 1 (8th Cir. 1966), the Court addressed itself to the issue. Distinguishing federal cases based on Rule 41(c) of the Fed.R.Crim.P., which hold that probable cause must be determined exclusively on the contents of the affidavit for the warrant, the Court noted that Rule 41(c)

> is only a procedural prescription as to the issuance of warrants by the federal courts.

> On substantive aspect, to which it is necessary here for appellants' contention to reach, the Fourth Amendment contains no prescription as to the form or manner in which probable cause must be shown, but merely provides generally that * * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation * * *.

368 F.2d 1, at 4.

The Court went on to state that it has sanctioned the use of sworn testimony taken before a magistrate prior to the issuance of a warrant as "a valid basis for the demonstration of probable cause in the issuance of a state warrant, and as not in this respect contravening the Fourth Amendment." 368 F.2d 1, at 4.

 The Court agrees with the Eighth Circuit and holds that a showing of probable cause is all that the language or spirit of the Fourth Amendment requires, regardless of whether written or oral, part of an affidavit or other document, recorded or not.

The Court has already found Detective Savino's testimony credible and has accepted it as substantially the fact. Accordingly, the Court concludes that petitioner's objections to the admission of Savino's testimony at the hearings held herein must be overruled as a matter of law, and furthermore holds that no constitutional barrier exists to using the officer's testimony to supplement the affidavits herein.

*(c) Particularity of warrants and duration of search period*

Petitioner also contends that the eavesdropping warrants lack the particularity demanded by the Fourth Amendment and permit eavesdropping of unreasonable duration. Mr. Pugach submits that the warrants are particularly deficient in naming the defendant as "John Doe." And he maintains that no showing was made as to why six months of eavesdropping were required. Respondent did not reply to the particularity argument, but asserted that the duration of the eavesdropping presents no problems since renewal orders were obtained.

The eavesdropping warrants in question identified the "place to be searched," as "Room No. 812, in premises No. 349 East 149th Street, Bronx County." Petitioner has testified, and the State has not denied, that "Room No. 812" was in fact a suite of rooms, housing Mr. Pugach and his two law partners, two associates who were also attorneys, another attorney and an assistant district attorney who was not affiliated with petitioner; the suite also included the desks of four secretaries. Thus, it must be conceded that the warrants failed to indicate precisely whose conversations were to be overheard. The Court, however, is aware of the practical factors, including the need for secrecy, which at this time and

place militated against an overparticularization in the warrant of the premises to be searched or the parties whose conversations were to be overheard.

■ As for the duration of the eavesdropping, the Court notes that separate showings of probable cause were made prior to the granting of the two extension orders. Part of the showing prior to the granting of the second extension order was that two suspects had telephoned petitioner. We may reasonably infer that the second eavesdropping period was undertaken with the purpose of overhearing additional contacts between the various suspects. Prior to the granting of the third extension, the police indicated that yet a third suspect had been seen in the vicinity of petitioner's office and that police agents had been sent to his office. The third extension order, evidently, was for the purpose of overhearing contacts with the third suspect as well as with the first two—and also to permit the overhearing of Mr. Pugach's conversations with the police informants. Under all the facts and circumstances, the six months of eavesdropping was not a period of unreasonable duration.

■ Mindful of the reasons for the duration and nonparticularization of the warrants herein, the Court might nevertheless feel constrained to hold the warrants violative of the petitioner's Fourth Amendment rights under the holding of Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). However, the particularity and durational requirements embodied in Berger do not apply retroactively to the case at hand. Unlike the probable cause requirement propounded in Berger which the Second Circuit deemed foreseeable from Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed. 2d 734 (1961), *cf.* United States ex rel. Pugach v. Mancusi, 411 F.2d 177, 179 (2d Cir. 1969), cert. denied, 396 U.S. 889, 90 S.Ct. 172, 24 L.Ed.2d 163 (1969), the *Berger* requirement that the " 'property' sought, the conversations, be par-

ticularly described," 388 U.S. 41, 58–59, 87 S.Ct. 1873, 1883, and the requirements militating against eavesdropping of long duration—including the requirements of prompt execution, termination when the sought information is seized, and a return on the warrant, 388 U.S. 41, 59–60, 87 S.Ct. 1873, could not be prognosticated from the previous case law development.

In Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Supreme Court applied the retroactivity requirements enumerated in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), to the Supreme Court's holding in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and held that *Katz* has prospective operation only, to the extent that it departs from previous holdings. While the Court recognizes that *Desist* dealt only with non-trespassory eavesdropping and is not binding precedent for dealing with the trespassory eavesdropping involved herein, see United States ex rel. Pugach v. Mancusi, 411 F.2d 177, 179–180 (2d Cir. 1969), cert. denied, 396 U.S. 889, 90 S.Ct. 172 (1969), the Court nevertheless finds its reasoning persuasive and concludes that the particularity and durational requirements spelled out in *Berger* should similarly have prospective operation only.

■ As the Supreme Court indicated in Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the retrospective application of new constitutional rules affecting criminal trials is not a matter of constitutional compulsion. Whether such decisions shall be applied retroactively or prospectively only is a function of three factors: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970 (1967) (holding that United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert

v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) have prospective application only).

The purpose to be served by the particularity and durational requirements of *Berger* was to carefully circumscribe eavesdropping procedures so that unauthorized invasions of "the sanctity of a man's home and the privacies of life" are prevented, and, specifically, to avoid the seizing of one thing under a warrant describing another. Berger v. New York, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883 (1967), quoting Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Two things should be noted in this regard: Firstly, that the allegedly offensive eavesdropping has already occurred, and will not be corrected by releasing the prisoner involved. *Cf.* Linkletter v. Walker, 381 U.S. 618, 637, 85 S.Ct. 1731 (1965). And secondly, that the requirements in question, unlike other rules accorded retroactive effect, do not bear on the relevance or reliability of the evidence seized or on the fairness of the trial itself, but rather are merely designed to enforce federal law. See Desist v. United States, 394 U.S. 244, 250, 89 S.Ct. 1030 (1969); Fuller v. Alaska, 393 U.S. 80, 81, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968). In short, giving the particularity and durational requirements of *Berger* retroactive effect would serve no justifiable purpose.

As for the reliance by law enforcement authorities and the effect on the administration of justice of retroactivity, it should be noted that these factors also weigh against retrospective application. The statute which *Berger* invalidated was first added to New York's Code of Criminal Procedure in 1942, N.Y.Code of Cr.Pro. § 813–a (McKinney's 1958), added L.1942, c. 924, and undoubtedly a substantial number of convictions were obtained in reliance on the validity of the statute. Furthermore, as the Supreme Court has noted,

> the determination of whether a particular instance of eavesdropping led to the introduction of tainted evidence

at trial would in most cases be a difficult and time-consuming task, which, particularly when attempted long after the event, would impose a weighty burden on any court. Desist v. United States, 394 U.S. 244, 251, 89 S.Ct. 1030, 1035 (1969).

Accordingly, the Court concludes that the standards of *Berger* are not applicable, and that the warrants herein were sufficiently descriptive and the eavesdropping, of reasonable duration. Petitioner's Fourth Amendment rights were not transgressed.

### (d) Eavesdropping as violative of Fifth Amendment

The prosecutor, Bronx Assistant District Attorney Alexander Scheer, testified on the hearing that his office had sought eavesdropping orders to overhear "any statement you [Pugach] make in connection with this incident" and "[a]ny statements that you may make that would be incriminating." Petitioner has argued that eavesdropping for the purpose of obtaining admissions violates the Fifth Amendment. This contention is without merit.

As a threshold matter it may be assumed that inculpatory statements of suspects are almost always the conversations sought to be overheard. If petitioner is correct that eavesdropping to obtain admissions violates the Fifth Amendment, then eavesdropping orders consonant with the Fifth Amendment are propably impossible. Mr. Justice Douglas, concurring, in Berger v. New York, 388 U.S. 41, 64–68, 87 S.Ct. 1873, 1886–1888 (1967) was of the view that whenever the accused is the "unwilling source of the evidence," use of that evidence violates the Fifth Amendment. This view was not adopted by the majority of the Court in *Berger*. The Supreme Court's earlier abandonment of the "mere evidence" rule in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) seems to undercut the view expressed by Mr. Justice Douglas' concurrence and requires the rejection of the

proposition that eavesdropping for the purpose of overhearing inculpatory statements is constitutionally objectionable.

■ The element of compulsion is at the core of the constitutional stricture, "nor shall [the accused] be *compelled* in any criminal case to be a witness against himself." (Emphasis supplied). See, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Hoffa v. United States, 385 U.S. 293, 303–304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Certainly, eavesdropping of conversations made not in custody, but in the privacy of one's office involves none of the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S.Ct. 1602, 1624. The constitutional danger in eavesdropping is one of the invasions of a person's privacy, not compulsion to incriminate oneself.

If the government had placed an informer in petitioner's office for the express purpose of overhearing inculpatory statements made by the petitioner, and if the informer later testified to the contents of such statements, the accused could not complain that his privilege against self-incrimination had been transgressed. Hoffa v. United States, 385 U.S. at 303–304, 87 S.Ct. 408. It is difficult to discern how the planting of microphones rather than informants is distinguishable for Fifth Amendment purposes. In each case the declarant is unaware of the use to be made of his statements; in each the suspect is the unwitting source of evidence. In both cases the inculpatory statements are voluntarily made without threats, force or compelling pressures. Petitioner's argument is untenable.

■ The Court, therefore, holds that the use of information obtained by eavesdropping against the petitioner was not violative of his rights under either the Fourth or Fifth Amendments. In view of the Court's findings and conclusions on the merits of the eavesdropping claims,

it is unnecessary to reach the question of whether evidence so obtained if unlawfully admitted would be harmless error.

It should be noted in this connection however, that the petitioner has repeatedly challenged the State to apprise him of how the police solved the crime. He claims that this was accomplished only through use of illegal means. In this record, he expressly disclaims any legal criticism of wiretapping of his conversations. He said: "There is no wiretapping involved here . . . I haven't raised any issue of wiretapping." He does as we have seen, challenge the legality of the eavesdropping as trespassory conduct in violation of his constitutional rights.

■ If the issue of eavesdropping be deemed not resolved by the rulings above, the record nonetheless gives ample indication that well before any eavesdropping, indeed from shortly after the time of the assault, the police reasonably and correctly suspected the connection of Pugach therewith. While he stoutly denied any connection to the crime in his talks with the police informants and for the benefit of the unknown eavesdroppers, his accomplices were voluntarily confessing. Two of them eventually pleaded guilty and the third was tried and convicted. The information garnered from eavesdropping and police informants was at best merely cumulative and "played a small part in an overwhelmingly strong record which contained many other similar admissions made by the defendant." People v. McCall, 17 N.Y.2d 152, 159–60, 269 N.Y.S.2d 396, 403, 216 N.E.2d 570, 574 (1966). That appraisal is amply vindicated by the record before this Court. The case against Pugach was not woven from circumstantial evidence. The evidence was overwhelming; and error if any here, was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967).

## II. COERCED ADMISSIONS CLAIMS

Petitioner claims that the use in evidence of admissions made by him to two police operatives violated his rights. He contends that any admissions were the fruit of an unlawful entry into his office and automobile in violation of the Fourth Amendment. Moreover, he maintains that admissions were obtained by the police agents as the result of blackmail, and hence were in violation of his Fifth Amendment rights. The state responds that petitioner has at times denied that any admissions were made to said police operatives and cannot object to the involuntary nature of statements, the existence of which he denies. Furthermore, the state answers that the use of agents to test petitioner's reactions was not tantamount to coercion, but merely a stratagem or subterfuge which did not violate petitioner's rights. Petitioner anticipates and refutes the notion that the testimony was harmless error or that he waived the issue, citing his attorney's vigorous cross-examination on the issue, the corroborating testimony by his codefendant, Harden, as to the existence of coercion and the trial court's allegedly erroneous charge, which petitioner asserts removed the issue of voluntariness from the jury's consideration.

Both of the police agents, Messrs. Mac Alan Gladding and Jose Monteiro, testified on the hearings as to the conversations which were the source of admissions used against petitioner at the trial. The petitioner gave his version of these conversations. A contemporaneous summary of notes taken by a police officer who was overhearing the earlier conversation over an eavesdropping device was admitted into evidence on the hearings. Furthermore, the Court has carefully examined petitioner's trial transcript in respect of the testimony in issue.

 Having heard all the witnesses and observed their demeanor on the witness stand and having examined all the evidence herein, the Court finds that the two conversations which were the source of admissions testified to by the prosecution witnesses[7] occurred substantially as follows:

During the latter part of September, 1959, the efforts of Gladding and Mon-

---

7. At the trial Gladding testified to the following, which could be regarded as admissions or tacit admissions by the petitioner:

"I said to Burton Pugach that I was aware of the facts of the Linda Riss case, that I knew Joe Louis, which is Heard Harden, Al Newkirk and Preacher McMillian, and that I knew that he hired these three men to blind Linda Riss and that all the other information that I knew was enough to put him in jail and if he did not give me $10,000, I was going to the police with this information. He told me, Burton Pugach told me that he didn't know what I was talking about and he denied having any knowledge of this and ordered me out of his office or he was going to call the police. I, in turn, told him, 'Go right ahead and call the police and I will sit her[e] and we will all greet them together,' and he says, 'Well, I tell you what I will do. I will give you $300. That's all the money I have. I will give you $300 right now because I don't want any bad publicity and we will forget about it,' and I told him that I did not want the $300; I wanted $10,-000 or nothing or I am going to the police.

He told me to please give him, don't go to the police, even though he said, 'I had nothing to do with this,' he said, 'Don't go to the police. Give me a couple of days to raise a little more money and think this over and we will talk again.'" Trial transcript at 1743–44.

Subsequently, when asked what observations he made of petitioner at the time of the conversation, he testified: "He turned pale, perspired in his face and he slumped all the way down in his chair, hanging to the side like this, like collapsed [indicating a slumped position]." Trial transcript at 1745.

Monteiro's version of the conversation included the following admissions:

"With that [the agents' accusation] he told us to get out of his office before he calls the police. I don't know if it was Mac or myself told him: 'Go ahead, call the cops, we'll sit down and wait.' Then he said: 'What do you fellows want.' We told him we want $10,000, no ifs and buts, we want ten thousand bucks now. So he said: 'Well, I haven't got $10,000, but I have $300.' We told him—I told him myself, to shove the $300 up his ass, I didn't want $300.

teiro, two former convicts (the "two" hereafter), were enlisted by the police to elicit information from various persons believed to be involved in the Linda Riss maiming case. The two had for a time been suspects in the case and had even been taken to the hospital where the victim was being treated, for the purpose of identification. The two procured Joe Raso (Joe Rowe) an acquaintance of the petitioner, to arrange a meeting for them with Pugach at his office. Around noon on Monday, September 28, 1959, Raso (or Rowe) brought Gladding and Monteiro to petitioner's office and introduced them as his friends to Pugach. Rowe then left the office. The two told petitioner that they had been arrested and beaten by the police in connection with the Linda Riss case, and intimated that they knew that petitioner had hired the assailant. They dropped the names of others involved in the case, and mentioned evidentiary details suggesting an intimate knowledge of petitioner's complicity. They demanded $10,000 and threatened to tell all they knew to the police if not paid. Pugach flatly denied any connection with the case and told the men to leave his office and threatened to call the police. However, the two coolly offered to wait for the police. Pugach then resumed the conversation. Petitioner said that there had been much publicity to the case and any suggestion that he might be connected therewith would be injurious to him professionally and while denying any complicity, he made an offer of $300 to them, under the guise of avoiding injurious publicity. His posture and perspiration tended to manifest a sense of nervousness. The $300 was unacceptable to the two. Petitioner then requested time to think over the matter, and said he would communicate with them and asked for their phone number. They declined this information but agreed to give Pugach time to think over their demand and said they would call petitioner at a later time of their choosing.

A second conversation occurred in petitioner's automobile on October 6 at about 6:30 or 7:00 P.M. while petitioner was stopped at a red light not far from his office.[8] Messrs. Gladding and Monteiro, together with Heard Harden, had been following petitioner's convertible in another car, and when Pugach stopped at a traffic signal at the corner of Morris Avenue and 161st or 162nd Street, Gladding got out of the latter auto and called to petitioner. Petitioner signalled to Gladding to enter and pulled his vehicle near the row of parked cars, double parking and leaving the engine running. Gladding again demanded payment of $10,000 to remain silent, and Pugach asked for assurance that he would not be approached in the future. Pugach was concerned about the effectiveness of any arrangement with the two. Pugach then

---

Then he said: 'Well, let's suppose that I was involved in this, what guarantee would I have that you wouldn't be back here next month, next week or tomorrow?' I believe Mac answered him by telling him: 'You got no guarantee.' Then he said: 'Well, go—I mean— think about it—give me a phone where I can reach you', and I don't recall if myself or Mac told him: 'Well, we got no phones for you; we'll reach you at our convenience, our time, our place,' and with that we left." Trial transcript at 1906-07.

8. At petitioner's trial, Gladding testified that when he again demanded the $10,-000, in the automobile, warning that otherwise he would go to the police, petitioner responded: "What guarantee would I have if I paid you $10,000 that you wouldn't be back tomorrow, the next day and the next day and the next day to shake me down?" Trial transcript at 1782.

Subsequently, according to Gladding, "He told me then that the only persons that could hurt him was Preacher Mc-Millian, Al Newkirk and Heard Harden. He said if they were out of the way he would be secure and I could never shake him down or bother him any more. He asked me how much would I charge him to knock off the three men, Heard Harden, Joe Louis [sic] and Preacher Mc-Millian." Trial transcript at 1782–83. And later still, Gladding testified, Pugach said, "Why should I give you a dime?" * * * "You might be pulling a bluff on me." Trial transcript at 1783.

inquired as to the cost of having McMillian, Newkirk and Harden put out of the way. Gladding quoted him a price of $15,000 in addition to the $10,000 previously mentioned. Petitioner said he deemed the price unduly expensive. Pugach then demanded assurances that Gladding in fact possessed incriminating information. Gladding mentioned phone calls which Pugach had received from his co-conspirators and he also offered to prove he knew Harden. He motioned to the car behind and Harden emerged and began approaching Pugach's car. Petitioner reacted violently; he jammed his foot on the accelerator, the car shot ahead and collided with other vehicles in the block. Petitioner was cut and bruised and Gladding was rendered unconscious. Petitioner was taken to the hospital and Gladding was arrested and handcuffed.

Petitioner's version of the two incidents was at odds with that testified to at the trial by the two. He claims that the first conversation was replete with specific threats of violence, including the threat of throwing petitioner out of the window. During the second conversation, as petitioner would have it, Gladding struck Pugach and struggled with him prior to the auto accident. At the hearings held herein, however, Gladding and Monteiro specifically denied using violence or threats thereof and their testimony appeared credible and corroborated by the circumstances and probabilities. The contemporaneous summary of the eavesdropping of the first conversation supports the version of the two police agents in every particular. Accordingly, the Court disbelieves petitioner and specifically finds that no violence was visited against petitioner by police agents and that the only threat herein was the threat of telling information to the police.

Furthermore, the Court specifically finds that the entry into petitioner's automobile at the time of the second conversation was upon the invitation and consent of petitioner—that Gladding did not climb or vault into the car unbidden as petitioner has contended. For this reason, the Court need only discuss the question of whether admissions were incident to an unlawful entry, in terms of the initial conversation that occurred in petitioner's office in September, 1959.

 The Court finds in this regard that the initial entry into petitioner's law office was with the consent of petitioner by appointment made through Pugach's friend, Joe Raso or Joe Rowe. During the conversation, petitioner at one point did order Gladding and Monteiro to leave or he would call the police. Gladding and Monteiro offered to wait for the police. The petitioner decided not to make the call and he resumed the conversation and inculpatory statements were made.

In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court held that verbal statements which derive so immediately from an unlawful entry and an unauthorized arrest as to be deemed the "fruit" of official illegality, must be excluded from evidence as in derogation of the Fourth Amendment. To the government's argument in Wong Sun that the defendant Toy's statements made in his bedroom subsequent to an unlawful invasion were not the result of the unlawful entry and arrest, but rather of an intervening volitional act by the defendant, the Supreme Court replied:

> This contention * * * takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion. 371 U.S. 471, at 486, 83 S.Ct. 407, at 416.

 The standard articulated in *Wong Sun* for judging what must be excluded as poisonous "fruit" is "whether, granting establishment of the pri-

mary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 471, at 488, 83 S.Ct. 407, at 417.

■ In this case the official illegality was low-grade, if any occurred at all. It consisted not of an unlawful entry or arrest, but of refusing to leave when told to do so. Indeed, the fact that petitioner continued the conversation after the agents' refusal to depart was a plainly implied consent that the two remain. In any event, in the Court's opinion, the admissions were not the fruit of trespassing, but of the agents' representation that they would inform the police of information incriminating the petitioner. The admissions, thus, were not obtained by the exploitation of official trespassing, but by means sufficiently distinguishable to be purged of the taint of trespassing.

It remains to be considered, however, whether the admission into evidence of petitioner's statements may be deemed violative of the Fifth Amendment because involuntary, or of the Fourteenth Amendment because the police employed an unconscionable stratagem.

The only federal cases found which have considered the issue have treated tacit and oral admissions precisely as they have treated confessions for the purpose of determining voluntariness under applicable constitutional standards and procedures. See United States ex rel. Gomino v. Maroney, 231 F.Supp. 154 (W.D.Pa.1964) (tacit admission by silence in face of accusation); United States ex rel. Schompert v. LaVallee, 238 F.Supp. 265, 266 (N.D.N.Y.1965) (spontaneous oral admission to police in bar and grill). This Court elects to do the same.

■ It is clear that in considering cases arising before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the "non-retroactivity of the decision in Miranda

does not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve long prior to our decisions in Miranda and Escobedo * * *." Davis v. North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966).

Davis states the rule that the Court is to consider the "totality of circumstances" in determining whether a confession (or admission) was voluntarily given or the result of police overbearing, and that the giving of Miranda warnings—while not conclusive—is a significant factor.

The pre-Escobedo cases are notable for their acute attention to the particular facts and circumstances involved in each. Among the factors considered were the race, intelligence and education of the accused; the length and conditions of detention; the age of the accused; the length of interrogation (if any); deprivation of contact with relatives, friends and attorneys; the employment of physical brutality or unconscionable means of deception; and the health and state of intoxication of the accused. See, e. g., confessions held involuntarily given: Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (mentally dull 19-year-old Negro held incommunicado without food, warnings or prompt arraignment and under threat); Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) (accused insane or incompetent, sustained interrogation, and surrounded by hostile police); Beeher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (under gunpoint threat and while wounded and under medication); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265 (1959) (foreign-born 25-year-old with junior high school education subjected to eight hours continuous questioning with sympathy falsely aroused); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954) (elicited by state psychiatrist versed in hypnosis who employed threats and promises subse-

quent to many hours of police questioning). But, see for a holding of voluntariness, Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958) (college-educated man with law training, 14 hours in custody without consulting attorney).

In the instant case, petitioner has established that the two police agents employed the threat of telling incriminating information to the police in order to elicit inculpatory statements. Petitioner also may point to the failure to give *Miranda* warnings prior to the conversations in question—these would obviously have been inconsistent with the ruse employed. On the other hand, neither of the conversations in question was of long duration. The subject involved, was a highly educated, successful, resourceful, quick-minded lawyer with a wide legal practise and exposure to all sorts of people in business and legal matters, sitting in his own law office during business hours and with unimpeded access to channels of communication and any person he might wish to call. He was under no restraint nor in anyone's custody. He was free to do as he pleased. No violence or threats of violence were involved. And the only thing which petitioner need fear was that Messrs. Gladding and Monteiro would tell to the police all of what they said they knew about a crime—an act which can hardly be classed as illegal or improper coercion and one which citizens have a duty to perform.

According to the probation report on petitioner submitted in September, 1961, prior to sentencing, which was produced at the defendant's request before this Court, petitioner was a Cum Laude graduate of the Brooklyn Law School ranking second in a class of 125 and was admitted to the New York Bar in June, 1949. He apparently achieved "spectacular" success in his personal injury law practice, and had interests in realty, in a Long Island night club and in the production of a motion picture. The report indicates a degree of emotional instability, but it is noteworthy that

this disability manifested itself primarily in his social relations rather than in his business or legal dealings. See People v. Pugach, 33 Misc.2d 938, 942, 225 N.Y.S.2d 822 (Bronx County Ct. 1962).

Evaluating all the facts and circumstances herein and resolving the issues of credibility in connection therewith, the Court concludes that petitioner's will was not overborne by any physical or psychological coercion. The standards of voluntariness were not violated in fact or in law under the circumstances present in this case.

The Court also concludes that the use of police informants posing as blackmailers to test the reactions of petitioner is a deceptive stratagem not inconsistent with due process of law under the Fourteenth Amendment. In Lewis v. United States, 385 U.S. 206, 208, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966), the Supreme Court held *inter alia* that the use of an undercover agent to pose as a narcotics purchaser was not unconstitutional, and that "the particular circumstances of each case govern the admissibility of evidence obtained by stratagem or deception." In Hoffa v. United States, 385 U.S. 293, 310–311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966), the Supreme Court specifically rejected the contention that the use of a government informer *per se* offended "those canons of decency and fairness" implicit in due process of law. The deception practiced herein was, like the ones in *Lewis* and *Hoffa,* designed to elicit evidence of criminal activity and was in no constitutional respect more objectionable. In view of this finding on the merits, the Court does not reach the question of whether petitioner waived his objection or whether the admissions were harmless error.

III. WILFUL USE OF PERJURED TESTIMONY AND CONCEALMENT OF EXCULPATORY INFORMATION.

Petitioner has charged that a wilful use of perjured testimony deprived him

of due process, as did the concealment of exculpatory information. In his final submission, petitioner listed six alleged instances during his trial when the District Attorney failed to correct alleged perjurious testimony which was actually known to him, or which should have been known to him as such. Furthermore, he asserts that each of those six items involved the suppression of exculpatory evidence, as also allegedly occurred in an additional ten instances.[9] The state contends that all the cited instances amount to deviations of no material consequence and that petitioner has not sustained his burden of proof on the issue. The Court agrees.

The law in this area is not in dispute. The categories of suppression and the standards to be applied thereto have been outlined recently in United States v. Keogh, 391 F.2d 138 (2d Cir. 1968). See also United States ex rel. Fein v. Deegan, 410 F.2d 13, 19 (2d Cir. 1969).

The first category consists of cases where the prosecutor's suppression is deliberate, "by which we include not merely a considered decision to suppress, taken for the very purpose of obstructing, but also a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention." 391 F.2d at 146–147, see, e. g., Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.

---

9. Petitioner's submission in this regard is as follows: "(Perjury)

1. The District Attorney failed to correct Linda Riss' testimony, identifying Harden, albeit not positively, by not making available her Grand Jury testimony where she did not identify him.

2. The District Attorney failed to correct Bertha Riss' testimony, identifying Harden, positively, by not making available her Grand Jury testimony, where she did not identify him.

3. The District Attorney failed to correct Linda Riss' testimony that Harden entered (burglarized) her room, by not making available her Grand Jury testimony that she did not see whether he entered the apartment and that she walked to the door.

4. The District Attorney failed to correct Linda Riss' testimony that her mother said 'It must be from Burt' when the assailant arrived, by not making available her Grand Jury testimony that her mother only 'realized,' 'it must be from Burt.'

5. The District Attorney failed to correct Linda Riss' testimony that I threatened her with acid Christmas, 1958, by not making available her Grand Jury testimony that I never used the word 'acid' and that Christmas, 1958, I offered her a four-carat ring.

(Concealment)

1. All of the above helpful Grand Jury testimony of Linda Riss and Bertha Riss was concealed, including no identification of Harden before Grand Jury.

2. Probation report information that there was no burglary concealed.

3. City Comptroller's testimony was concealed, with facts that assailant was 'outside' and thus was not in Linda's room to commit a burglary (P. 4), that her mother did not exclaim 'It must be from Burt' as testified at trial (P. 4), that she went to police in response to telephone call from woman in February 1959 (P. 12) not a threat by me Christmas, 1958 (Tr.Rec. P. 288) and that no one ever threatened her with acid. (P. 25); Mr. Scheer testified he had this City Comptroller testimony but didn't testify when he got the same—burden rests on him to prove facts within his own knowledge * * *.

4. Testimony of Detectives Hundgen and Scholl was concealed at trial and before Justice Starke that Linda had reported I annoyed, but not threatened her.

5. Statement of Lieutenant Weldon * * * was concealed at trial and before Justice Starke that Linda had reported I annoyed, but not threatened her.

6. Concealed at trial were material facts that prosecution witnesses Newkirk and Monteiro were suspects.

7. Concealed was that no investigation was made if Linda was victim of misidentification, the target being one Kerr.

8. Concealed was Susan Eden's Grand Jury testimony that January, 1959 she signed legal papers in my office and then I solicited her to find assailant, since I had no case with her then, and that I held a gun on her to find an assailant, a ridiculous tale abandoned by trial.

9. Concealed Israel's Grand Jury testimony, which makes no mention that he saw Harden in my office, contrary to his trial testimony.

10. Concealed Newkirk's Grand Jury testimony that he does not remember exact name and address on a piece of paper, in contrast that it was Linda Riss, 1124 Grant Avenue, at trial."

2d 690 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964). As the Court noted, "almost by definition the evidence [in this category] is highly material." *Id.*

In the second category are cases where the prosecution suppresses evidence favorable to the accused after a request has been made by the defendant and where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecution. See, Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Of the third category, the Court of Appeals in *Keogh* said the following:

> There remains a third category of cases—where the suppression was not deliberate in either of the senses we have included and no request was made, but where hindsight discloses that the defense could have put the evidence to not insignificant use. While we do not dispute that relief may sometimes be granted even in such cases, the standard of materiality must be considerably higher. 391 F.2d at 147.

The opinion further states:

> Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different. Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to require a substantially higher probability that disclosure of the evidence to the defense would have altered the result. To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties. 391 F.2d at 148.

Having taken extensive testimony on each of the alleged instances of suppression, and having read all the documents brought to the Court's attention, the Court is convinced that the alleged instances of suppression were in no sense deliberate. Furthermore, the defense did not by a timely request flag the importance of any of these items, which would have imposed a duty on the prosecutor to make a careful check of his files. 391 F.2d at 147.

■ Even viewing the minor deviations presented herein in the light most favorable to petitioner, the Court cannot conclude that the instances present the high degree of materiality necessary to sustain the writ on this ground. In fact, the Court concludes that the items —although conceivably helpful in cross-examining certain of the witnesses—are immaterial verbal deviations or omissions easily explainable; in any event, the production of the indicated matter would not have altered the result.

For instance, the fact that the victim on one occasion indicated that she saw her assailant in "her room", and on another occasion omitted mentioning his location, whereas during the trial she indicated that the lye-thrower put his foot across the lintel into the foyer a matter of inches from the doorway to her room, is a deviation which if exposed on cross-examination, would easily have been explained to the satisfaction of the jury. Similarly, the prosecution's failure to reveal a report indicating that an unknown light-skinned Negro, who may have been the assailant, inquired of a neighbor whether a "Kerr" lived in the building—which petitioner claims tends to prove that the assault on Riss was the result of a misidentification—is hardly a material instance of suppression.

Petitioner's claims of unlawful suppression are, in the Court's view, extravagant. In view of the detailed examination of each item on the record compiled herein, however, the Court sees no need in this opinion to review the separate allegations in greater detail.

## IV. DENIAL OF RIGHT TO ACT PRO SE

Petitioner claims that the denial of his application to proceed *pro se* when his trial counsel was temporarily relieved constituted the denial of a constitutional right. The state replies that petitioner's trial counsel was never relieved, that once the trial has begun a criminal defendant's right to discharge his attorney and proceed *pro se* is limited, and that in any event, denial of petitioner's application made late in a lengthy trial for the purpose of disrupting the proceeding was proper. Again the Court must agree with the respondent.

The trial transcript discloses, Tr.Rec. 3249–55, that on June 30, 1961, 11 weeks into the trial, in a robing room conference, petitioner's attorney Lowenberg moved to withdraw from the case, and to permit a co-counsel to take over. The court denied the motion, but indicated that co-counsel, Miss Frances Kahn, might examine or cross-examine any of the witnesses, with Mr. Lowenberg remaining as trial counsel. Then in open court, petitioner said he wished to take over his own defense. The application was denied. After a luncheon recess, the trial judge announced in open court what had transpired.

Subsequent applications to withdraw were similarly denied. Tr.Rec. 3297–3307. Petitioner indicated in the hearings held herein that he wished to proceed *pro se* in part so that he might change the trial strategy from the defense of insanity to negativing the evidence of his complicity in the crime charged.

 The standard applicable in this Circuit to requests to discharge counsel and proceed *pro se* was articulated in United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2d Cir. 1965), cert. denied sub nom. Di Blasi v. McMann, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966):

> The right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start

of the trial. \* \* \* Once the trial has begun with the defendant represented by counsel, however, his right thereafter to discharge his lawyer and to represent himself is sharply curtailed. There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance.

 The Court of Appeals has deferred to the trial judge's determination in denying a mid-trial application to discharge counsel and proceed *pro se* where three days of trial had elapsed and the prosecution's case was already in. United States v. Catino, 403 F.2d 491 (2d Cir. 1968). A *fortiori*, the same deference is warranted where 11 weeks have elapsed and not only has the prosecution completed its case, but counsel have begun putting in a defense of insanity which the petitioner belatedly wished to abandon.

Furthermore, the Court is of the opinion that where a criminal defendant's retained counsel attempts to prove that his client was insane at the time of the alleged unlawful conduct, then a trial court must regard applications to discharge counsel and proceed *pro se* with special scrutiny—both because of the potential disruption of proceedings and the substantial possibility of prejudice to the defendant. See discussion in People v. Pugach, 33 Misc.2d 938, 225 N.Y.S.2d 822 (Bronx County Ct. 1962).

Accordingly, we find this claim also without merit.

## V. INCOMPETENCY OF TRIAL COUNSEL

Petitioner claims that the alleged incompetency of his trial counsel, Mr. Henry Lowenberg, deprived him of the effective assistance of counsel in contravention of the Sixth Amendment. Specifically, petitioner claims it was constitutional error to fail to conduct a hearing as to the sanity of Mr. Lowenberg after the latter allegedly manifested

three instances of disorientation and apparent irrationality. Petitioner also argues that the failure of the trial court to inquire as to the differences undermining his relationship with his attorney denied him effective assistance. He points to his attorney's failure to argue for an acquittal on the burglary charge; his counsel's alleged failure to prepare or consult with petitioner; and to what he regards as "the assignment of Frances Kahn at the midpoint despite her absences for most of the trial."

The Attorney General responds that a study of the trial minutes establishes Mr. Lowenberg's competent representation and full protection of petitioner's rights at trial.

As the Second Circuit has time and again noted, *e. g.*, United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949) cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); United States v. Garguilo, 324 F.2d 795, 796 (2d Cir. 1963); United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965); United States v. Bentvena, 319 F.2d 916, 935 (2d Cir. 1963), stringent standards are applied to claims of inadequacy of counsel:

> In order to assume constitutional proportions, "A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." * * * If counsel's representation is so "horribly inept" as to amount to "a breach of his legal duty faithfully to represent his clients interests," * * * there has been a lack of compliance with the fundamental fairness essential to due process. United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967).

A federal court may not grant habeas relief for mere tactical or strategic errors in the handling of a state court case, which become visible only in hindsight. United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963); United States v. Duhart, 269 F. 2d 113 (2d Cir. 1959); United States v. McGuire, 381 F.2d 306, 319 (2d Cir. 1967), cert. denied sub nom. Perry v. United States, 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968). Nor may a federal court grant relief because subsequent examination of a case fails to disclose "that every conceivable avenue of evidence has been totally explored [by counsel] and every possible theory of defense has been pursued to judgment." United States ex rel. Boucher v. Reincke, 341 F.2d 977, 981 (2d Cir. 1965). Nor does a showing of lack of rapport between counsel and client, in the absence of proof of ineffective assistance, suffice to support a finding that a constitutional right was deprived. Shaw v. United States, 403 F.2d 528 (8th Cir. 1968); Lamoureux v. Commonwealth of Massachusetts, 412 F.2d 710, 712 (1st Cir. 1969).

On the other hand, proof that a criminal defendant's attorney was mentally incapacitated and of unsound mind may constitute the deprivation of the effective assistance of counsel. Andrews v. Robertson, 145 F.2d 101 (5th Cir. 1944), cert. denied 324 U.S. 874, 65 S.Ct. 1013, 89 L.Ed. 1427 (1945). Furthermore, the alleged acts of incompetence may be of a form which will not be readily apparent to the trial judge, and need not be acts which the trial court has a duty to correct. United States ex rel. Maselli v. Reincke, 383 F. 2d 129, 133 (2d Cir. 1967).

With these principles in mind, the Court turns to petitioner's claims. As to the failure to conduct a sanity hearing of petitioner's counsel, the Court concludes that the incidents at trial relied on by the petitioner [10] did not give

---

10. The first instance of apparent irrationality occurred on May 10, 1959, during the cross-examination of Linda Riss. The trial record, at pages 473–74, reads as follows:

"Q. Now Miss Riss—
MR. LOWENBERG: May I proceed?
A. Miss Riss, I believe you testified—
THE COURT: We're waiting, Mr. Lowenberg.

rise to any duty on the part of the trial judge to conduct a formal hearing. The record indicates that after each incident of counsel's supposed illness, the Court made informal inquiry in the robing room, Tr.Rec. 3299–3300, and learned that counsel suffered from mental fatigue. The trial record and Mr. Lowenberg's testimony at the hearings held herein manifest that counsel felt himself under a great deal of strain during the trial and apparently reacted emotionally as one does to substantial pressure. This was due to the demands made upon him by a client, who, in the words of the trial judge, "embarked upon a calculated, premeditated and predetermined course of conduct and procedure aimed at not only obstructing, impeding or delaying the progress of this trial but to bring about a mistrial or disruption of this trial in toto in some way, manner or form." Quoted in, People ex rel. Pugach v. Klein, 30 Misc.2d 334, 336, 217 N.Y.S.2d 885, 887 (Bronx County Sup.Ct. 1961). Tr. Rec. at 2739. We do not take literally Lowenberg's assertion at the hearings held herein that petitioner "drove him crazy"; this figurative expression is properly to be understood in its colloquial

MR. LOWENBERG: Pardon me?
THE COURT: We're waiting for you to proceed.
MR. LOWENBERG: I didn't hear Your Honor.
THE COURT: We're waiting for you to proceed.
MR. LOWENBERG: Well I have to report now to a—
MR. SCHEER: I don't know what's going on here.
(The following at the bench:)
MR. LOWENBERG: —for that's gentle for in full—
MR. SCHEER: I don't hear.
MR. LOWENBERG: We have to appear in the case of People against defendant here and others for purposes of trial. We have to appear there this morning before Judge, what's the name, what's his name?
MR. SANDERS: Smith.
MR. LOWENBERG: Smith. Before the County Judge for purposes of trial, so that I have to proceed, so I submit that the client is needed in this matter because of these—
THE COURT: What is needed?
MR. LOWENBERG: An engagement is required of this matter because of us having to go right over to the County Court in this matter.
MR. SANDERS: Your Honor, would you adjourn now please?
THE COURT: All right, we'll take a recess into Chambers."
After a short recess, the Court adjourned the session until the next day at noon.

The second incident occurred during the direct examination of prosecution witness Guiseppe Fiducia, on May 23, 1961. Mr. Lowenberg removed his coat, put a cigarette in his mouth and engaged in the following colloquy, reported in the trial record at 1184–1184A:

" MR. LOWENBERG: It's now 2:40, and I understand that they are opening the wards, that is, the lines at 9:00, 9:30, see, which means that I have to withdraw at the end of this day, mistrial and register my objection, my appeal for a continuance of the trial of this case, because of the fact that I have to be back there and have to—
THE COURT: Where do you have to be back to?
MR. LOWENBERG: Right back to the trial.
MR. SCHEER: May I—
MR. SANDERS: (Interposing) Just a minute.
THE COURT: In Washington?
MR. LOWENBERG: It's not held in Washington, but it can be held in—in—what do you call it—I have the minutes. It's that we have it—we belong to various other cities.
MR. SANDERS: May it please the Court, at this time would your Honor call a recess and I'd suggest the courtroom be cleared at this time while we're at the Bench.
THE COURT: We'll go in Chambers.
MR. SANDERS: All right.
THE COURT: It's quite apparent that Mr. Lowenberg has become disoriented and confused, and, undoubtedly he is not in any position to go on at this time. He may be feeling ill, I don't know."
The third instance of Mr. Lowenberg's apparent disorientation relied upon occurred on July 12, 1961, during counsel's summation. Mr. Lowenberg stopped his argument in mid-sentence. The case was adjourned until the next day at Mr. Sanders' motion and Mr. Lowenberg began his argument again at that time. See trial record at 3841–41A.

sense. The trial record, taken as a whole, manifests Lowenberg's mental competence and alertness at the time of trial. The incidents complained of did not individually or collectively prejudice petitioner and had little impact on the handling or result of his case. Accordingly, the Court finds no merit in this contention.

Moreover, the Court concludes that the trial judge's failure to delve into the circumstances of petitioner's lack of rapport with his retained counsel was not a denial of effective assistance, since the disharmonious relations between attorney and client here did not substantially impair the effective assistance afforded petitioner. Having had an opportunity to hear Mr. Lowenberg's testimony and judge his demeanor on the witness stand, as well as having examined the trial transcript, the Court finds that retained counsel prepared himself appropriately for his tasks at the trial and conferred with petitioner on numerous occasions and endeavored to follow up many of the leads which the defendant suggested— petitioner's contrary assertions notwithstanding. The fact that counsel refrained from calling every witness or following every lead suggested by his client is, as noted above, constitutionally irrelevant.

Similarly, the fact that Mr. Lowenberg declined to argue in his summation for an acquittal on the burglary charge is equally irrelevant, since tactical considerations evidently dictated this choice, which was a rational view to entertain at the time. It is true that by hindsight the burglary counts, which became the source of a 15-year consecutive sentence, have assumed an impact of immense importance to the petitioner. However, an attorney trying a case can hardly be held accountable for failing to prognosticate the sentence that would be imposed in the event his chosen strategy did not succeed in obtaining an acquittal. Mr. Lowenberg devoted his summation to the argument that petitioner was insane at the time of the commission of the crime and that he should be found not guilty by reason of insanity if the jury concluded he was involved. Medical experts had classified the defendant as a paranoid schizophrenic and they had so testified on the trial. During his argument, counsel reviewed and contrasted the conflicting expert psychiatric testimony and strenuously urged the proposition that anyone who could hire others to blind his former sweetheart must be mad. Perhaps another attorney would have deemed it unwise to rely on an insanity defense to the exclusion of a defense on the merits, as does Mr. Pugach. However, petitioner is not entitled to federal relief because he chooses to second-guess his counsel at this stage of the proceedings.

As to the claim that Frances Kahn's mid-trial "assignment" despite her absences deprived petitioner of effective representation, the Court notes its previous finding that Miss Kahn was co-counsel throughout the proceedings, and was permitted to examine and cross-examine the psychiatric witnesses by the trial judge, but was in no sense assigned as substitute counsel for petitioner. In conclusion, we find that petitioner's representation was reasonably able and effective, and that petitioner was in no sense deprived of his Sixth and Fourteenth Amendment rights to counsel.

## VI. USE OF CO-DEFENDANT'S CONFESSION

Petitioner claims that the admission in evidence during his trial of a co-defendant's confession without redacting his name was a deprivation of his right of confrontation, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which was held retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968). Mr. Pugach maintains that the co-defendant's confession was intentionally used against him. Furthermore, he argues that the effectiveness of limiting instructions given by the trial judge was vitiated by an alleged instruction from the court that the confession was usable against the petitioner. Mr. Pugach asserts also

that the availability of the co-defendant for cross-examination as a witness on the trial did not cure the matter since the co-defendant merely denied the substance of the confession. And finally, petitioner contends that the use of the confession cannot be deemed harmless error in that (i), it was employed as a foundation for the admission against him of a bottle of lye used in the assault, and (ii), it was the sole source of evidence as to the payment by petitioner to the assailant, and as to the method used to point out the victim and as to petitioner's responsibility for the choice of the instrument of assault.

The Attorney General responds, in essence, that the availability of the co-defendant for cross-examination undercuts any application of the *Bruton* rationale to the case. The State also maintains that any error herein was harmless.

The confession in question was originally given by the assailant Heard Harden to Detective Jeremiah O'Connor, Lieutenant Weldon and other police officers at the 45th Precinct in the Bronx between 5:30 and 6 o'clock on the morning of October 30, 1959. Harden's confession, as testified to by Detective O'Connor, Lieutenant Weldon, Raymond McCue—a "confidential stenographer" —and others detailed his relationship with petitioner and their complicity in the crime. Harden stated that he was introduced to Pugach through Al Smith Newkirk and Walter McMillian in front of Pugach's office on June 8, 1959, and explained how Pugach bargained with Harden at a nearby bar as to the crime to be perpetrated against Linda Riss and the price to be paid for the crime. Harden further said that in a telephone conversation the next evening, Harden again bargained with petitioner over the terms of payment and arranged to have Pugach point out the victim for him.

The confession recited that on the following day, June 10th, McMillian, Harden and Pugach drove to Linda Riss' office. On the way, Pugach purchased "Red Devil" lye, baking powder and sparkling water. On petitioner's instructions, Harden emptied the baking powder from the can and used the can to mix the lye and sparkling water. Harden and Pugach, Harden's statement continued, followed Miss Riss into the subway, took a train to her stop, and waited for her to approach her apartment. Due to petitioner's last-moment reluctance, however, the assault was postponed. Harden came to Pugach's office on June 11th and petitioner subsequently gave Harden a photograph of his victim, and discussed alternative plans for the assault. That evening Harden, McMillian and Pugach drove over to Linda's apartment to reconnoiter the premises. Harden and petitioner were in contact several times over the weekend. At one point, Pugach—according to Harden's confession—told the assailant to practice his aim by throwing lye in his bathtub. Harden then recited how he purchased "Red Devil" brand lye—on Pugach's recommendation that that brand was best—on Monday morning, June 15, drove to Linda's apartment, mixed the solution, posed as a deliveryman and perpetrated the assault.

Subsequently, Harden contacted Pugach and they met after 10 o'clock the same night near the corner of 89th Street and Central Park West. After discussing the effectiveness of the assault, and the unlikelihood that Harden would be identified, Pugach paid Harden $2,000 in forty $50 bills. Harden also stated that he had received additional sums of $100 on two separate occasions more than a month after the assault.

The un-redacted Harden confession, as repeated by various witnesses, was indubitably inculpatory of the petitioner. In spite of the trial court's repeated admonitions that the confession was not admissible against Pugach, it is impossible to minimize the effect that the confession must have had on the jury. In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620 (1968), the Supreme Court acknowledged its repudiation of the premise of Delli Paoli ·v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d

278 (1957), that a jury is capable of following a judge's reasonably clear instructions to disregard a co-defendant's extra-judicial statement that the defendant participated with him in the commission of the crime. 391 U.S. 123, at 126, 88 S.Ct. 1620.

■ In spite of the use of the un-, redacted co-defendant's confession here, however, we hold that petitioner was not deprived of any constitutional right. *Bruton* explicitly rests on the rationale that the use of a confession of a co-defendant who never testified denies the defendant the right to cross-examine his accuser, a right secured by the Confrontation Clause of the Sixth Amendment. However, in the instant case, Heard Harden did take the stand and petitioner's attorney, Henry Lowenberg, exercised his opportunity to cross-examine the co-defendant as to the truth of his extra-judicial statement. Harden's direct testimony was to the effect that his only connection with the case was his involvement with Monteiro and Gladding in an effort to extort money from Pugach. Harden further testified that the confession had been coerced from him by a combination of beatings, threats and the promise that he would only have to serve a two-year sentence. Lowenberg, on cross-examination, elicited the further statement that Harden had never been to Pugach's office or home. It is difficult to conceive of any fuller opportunity that might have been afforded petitioner to cross-examine and contradict the co-defendant's extra-judicial statements or a more favorable result that might have been obtained.

Petitioner's contention that Harden's confession was intentionally used against him has received no credible substantiation in the hearings held herein. It is fair to assume that the state authorities were offering this evidence in reasonable reliance on the rule of *Delli Paoli* and on the frequent instructions of the trial court that Harden's statements were admissible against Harden alone. As for Pugach's claim that the effectiveness of the trial Judge's limiting instructions was vitiated by an alleged statement in his charge that the confession was usable against petitioner, the Court finds this assertion also without merit. The mention of Harden's out-of-court statement in a list of evidence used to corroborate the testimony of accomplices against petitioner and Harden was not tantamount to an instruction that Harden's statement was usable against Pugach. The Court finds that the numerous, repeated instructions and admonitions of the trial court amply indicated otherwise. In any event, the clarity of the trial court's instruction is only in issue as an element of the *Delli Paoli* test. Since the Court finds that petitioner's rights were not infringed under the more stringent *Bruton* test, any ambiguity in the trial court's instruction is immaterial.

■ The Court, furthermore, is unimpressed with petitioner's argument that effective confrontation was possible "only if the co-defendant affirmed the statement" which he allegedly did not do. Petitioner's reliance on Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) is inapposite. In *Douglas*, the petitioner and an alleged accomplice, Loyd, were tried separately in state court for assault with intent to murder. The alleged accomplice was called as a witness in petitioner's trial but repeatedly refused to testify on self-incrimination grounds. Under the guise of cross-examining the accomplice as a hostile witness, the prosecutor, over objection and despite Loyd's continued refusal to answer, read in the presence of the jury the latter's purported confession, which implicated the petitioner. In this regard, Mr. Justice Brennan noted:

Since the Solicitor was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him. Nor was the opportunity to cross-examine the law enforcement officers adequate to redress

this denial of the essential right secured by the Confrontation Clause. Indeed, their testimony enhanced the danger that the jury would treat the Solicitor's questioning of Loyd and Loyd's refusal to answer as proving the truth of Loyd's alleged confession. But since their evidence tended to show only that Loyd made the confession, cross-examination of them as to its genuineness could not substitute for cross-examination of Loyd to test the truth of the statement itself. * *

Hence, effective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer. * * * 380 U.S. at 419–420, 85 S.Ct. 1074, 1077.

In the instant case Harden did admit to making the statement but went on to deny the truth of its contents.[11] Thus, Pugach had the opportunity of cross-examination that was denied to Douglas —the opportunity to delve into the underlying facts of the inculpatory statement. The fact that the jury chose to believe that Harden was telling the truth when he made his extra-judicial confession rather than when he repudiated that statement on the witness stand is of no constitutional moment. Pugach's right of confrontation was not abridged.

The Court also rejects petitioner's contention that United States v. Guajardo-Melendez, 401 F.2d 35 (7th Cir. 1968), should dispose of the case. Although, in *Guajardo-Melendez* the Seventh Circuit overturned the conviction of the appellant in spite of the fact that the co-defendant whose extra-judicial statement implicated him took the stand, the court there noted that it was not clear as to whether the co-defendant could have been cross-examined concerning his extra-judicial statements, since these were beyond the scope of the co-defendant's direct testimony. 401 F.2d at 38, n. 5.

Furthermore, the case involved a federal conviction and the court failed to indicate whether it was acting under its supervisory power or as a matter of constitutional necessity; the Seventh Circuit did disclaim any literal application of *Bruton* to the facts of that case. 401 F.2d at 38.

The Second Circuit does not appear to have as yet considered whether *Bruton* applies where the co-defendant testifies at the trial. It has been held not to apply by the Ninth Circuit when a co-defendant has taken the stand and become available for cross-examination. Santoro v. United States, 402 F.2d 920 (9th Cir. 1968); Rios-Ramirez v. United States, 403 F.2d 1016 (9th Cir. 1968), cert. denied 394 U.S. 951, 89 S.Ct. 1292, 22 L.Ed.2d 486 (1969). The New York Court of Appeals also so reads *Bruton*, People v. Anthony, 24 N.Y.2d 696, 301 N.Y.S.2d 961, 249 N.E.2d 747 (1969). Furthermore, other circuits, including the Second, have indicated in analogous circumstances that the logic of *Bruton* is inapplicable when an opportunity for cross-examination exists. See, *e. g.*, United States v. Ballentine, 410 F.2d 375 (2d Cir. 1969); United States v. Catino, 403 F.2d 491, 496 (2d Cir. 1968); United States v. Hoffa, 402 F.2d 380, 387 (7th Cir. 1968), vacated on other grounds sub nom. Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); United States v. Boone, 401 F.2d 659, 663 n. 12 (3rd Cir. 1968), cert. denied sub nom., Jackson v. United States, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). The New York Court of Appeals has also ruled that *Bruton* does not apply where opportunity to cross-examine was afforded at a Huntley hearing. People v. Galloway, 24 N.Y.2d 935, 301 N.Y.S.2d 994, 249 N.E.2d 771 (1969).

In view of the Court's holding on the merits of this claim it is unnecessary to reach the issue of harmless error. *Cf.*

11. Harden's extensive testimony as to his police interrogation indicates that he agreed to make statements for, or "go along with" the police and "play ball" by testifying against his co-defendants at the Grand Jury and trial; he later changed his mind. See trial transcript at 2851–86.

722

Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). However, the Court notes in passing that Harden's confession was not employed as the foundation for the admission against Pugach of the lye bottle. Rather, the testimony of Guiseppe Fiducia, the husband of the landlady of Linda's apartment who retrieved the bottle during the course of the conspiracy, was the foundation. Furthermore, Harden's confession was not the sole evidence as to the method used to point out the victim. Maria Fiducia, daughter of Guiseppe, testified that she observed Pugach in an automobile in front of Linda's apartment building on the evening of June 11th or 12th, 1959, pointing to the building. Although she could not identify the other occupants of the auto, she later identified the car of Walter McMillian as the one she had seen.

## CONCLUSION

At the conclusion of the hearings, the Court reconfirmed that petitioner had no further federal claims:

THE COURT: You were put on notice that all federal questions, once and for all, were to be presented to me.

MR. PUGACH: Yes.

THE COURT: That means that you are not holding back or reserving any federal questions at this time, is that correct?

MR. PUGACH: Right.

*Non constat,* at the time of final argument a few weeks later, Mr. Pugach came in with "proof" of perjury of witnesses in the hearing before this Court and moved to reopen the issues. By comparing answers of the witnesses given on other occasions in other proceedings with those given here, the petitioner sought to make out a basis for reopening the hearings and a finding in his favor.

Suffice it to say, the issues so raised are essentially ones of credibility which have been considered and already resolved adversely to the petitioner and the alleged "new" matter does not require a change of the determination made or merit an additional hearing thereon. The motion for a further hearing is, in all respects, denied.

The Civil Rights suit referred to above, 69 Civ. 3633, has been discontinued by stipulation of the parties executed by them and approved by the Court on February 20, 1970.

The petitions for writs of habeas corpus are severally and in all respects, denied on the merits and with prejudice. The application to appeal herefrom *in forma pauperis,* is granted a certificate of probable cause is denied.

A separate order to the foregoing effect, referring to this determination, shall be entered by the Clerk in respect of each petition for habeas corpus dealt with herein.

So ordered.

## APPENDIX

The following is a compilation of federal proceedings, decisions and orders, reported and not, brought by petitioner subsequent to his arrest in connection with the Bronx County maiming indictment. The nature of each suit, the claims raised therein and the disposition thereof, is indicated in the parentheses.

*Pre-Conviction*

1. Pugach v. Sullivan, 180 F.Supp. 66 (S.D.N.Y.1960), stay granted pending appeal sub nom. Pugach v. Dollinger, 275 F.2d 503, (2d Cir. 1960), aff'd en banc, 277 F.2d 739 (2d Cir. 1960), cert. granted, 363 U.S. 836, 80 S.Ct. 1614, 4 L.Ed.2d 1723 (1960), stay modified pending final determination by Supreme Court, 280 F.2d 521 (2d Cir. 1960), leave to argue as amicus curiae denied, 364 U.S. 926, 81 S.Ct. 352, (1960), leave to file brief as amici curiae granted, 364 U.S. 929, 81 S.Ct. 376, (1961), aff'd per curiam, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961) (civil rights suit to enjoin divulgence of wiretaps and use thereof at pending criminal trial; preliminary injunction denied, complaint dismissed).

2. Pugach v. United States, 60 Civ. 4889, (S.D.N.Y., filed Dec. 14, 1960) (habeas petition alleging violation of Thirteenth Amendment; petition denied for failure to exhaust state remedies).

3. Pugach v. Klein, 193 F.Supp. 630 (S.D.N.Y.1961), leave to file briefs and appendices granted, No. 26990 (2d Cir. July 11, 1961), appeal dismissed, Nos. 26989 and 26990 (2d Cir. Aug. 8, 1961) (applications for habeas corpus, mandamus and warrants of arrest and search; applications denied for failure to exhaust state remedies, lack of jurisdiction and insufficiency).

4. Pugach v. Kennedy, 62 Civ. 872 (S.D.N.Y. Feb. 26, 1962) (denying appointment of counsel to prosecute pro se claims and transfer to federal detention), partial summary judgment, habeas corpus and taking of depositions denied, (S.D.N.Y. March 28, 1963), habeas corpus, summary judgment and cross-motion for dismissal denied, (S.D.N.Y. May 23, 1963), leave to appeal denial of summary judgment in forma pauperis denied, (S.D.N.Y. June 7, 1963) (civil rights suit against police alleging illegal eavesdropping, extortion, unlawful search in connection with gun possession prosecution, unlawful arrest on maiming charge and police perjury; still pending).

5. Pugach v. Rothstein, 62 Civ. 873 (S.D.N.Y. Feb. 26, 1962) (denying appointment of counsel to prosecute pro se claims and transfer to federal detention), production of petitioner for oral argument and cross-motion to consolidate with state civil action denied, (S.D.N.Y. March 15, 1962), complaint dismissed, (S.D.N.Y. April 26, 1962) (civil rights suit to enjoin prosecution of victim's civil suit; complaint dismissed).

*Post-Conviction*

1. United States ex rel. Pugach v. Herold, 212 F.Supp. 828 (N.D.N.Y.1962), leave to argue pro se application to appeal in forma pauperis denied and hearing on appellant's poverty ordered, No. 28300 (2d Cir. Feb. 15, 1963), leave to appeal in forma pauperis granted and counsel appointed, No. 28300 (2d Cir. May 8, 1963), motion for production of appellant and for bail pending appeal denied, No. 28300 (2d Cir. June 4, 1963), motion for production of appellant to argue appeal denied, No. 28300 (2d Cir. Oct. 7, 1963), appeal withdrawn, No. 28300 (2d Cir. April 6, 1964) (habeas petition alleging insufficiency of evidence, failure to set reasonable bail pending appeal and unlawful eavesdropping; petition denied for failure to exhaust state remedies).

2. United States ex rel. Pugach v. Wilkins, (2d Cir. June 29, 1964) (application transferred to W.D.N.Y.), leave to file in forma pauperis granted, Civil No. 11,004 (W.D.N.Y. July 21, 1964), applications for writs of habeas corpus denied, (W.D.N.Y. Dec. 11, 1964), application to vacate order denied, (W.D.N.Y. Feb. 8, 1965) (habeas petitions alleging trial court's refusal to allow petitioner to defend himself, fraudulent prosecution, suppression of evidence, court's participation in investigation and prosecution of case, wilful use of perjured evidence, instruction that defendant had burden of proving innocence, fraudulent characterization of testimony, wilful misquoting of testimony by court and prosecutor, instruction that co-defendant's out-of-court statements are evidence against petitioner, admission of evidence unconnected with petitioner, illegal use of eavesdrop evidence, use of acts and declarations of petitioner produced by extortion and threats of police, prosecution for refusal to continue to pay state officers extortion money, and incompetency of trial counsel; petitions denied as without factual foundation).

3. Pugach v. Bronx County Bar Ass'n, 64 Civ. 1659 (S.D.N.Y. Sept. 15, 1964) (granting dismissal for failure to state a claim), leave to appeal in forma pauperis, transcription of record and injunction pendente lite denied, Docket No. MR-113 (2d Cir. July 9, 1965) (petition to convene three-judge court to enjoin state officers from interfering with right to practice law and challenging constitutionality of maiming and firearms stat-

utes; petition denied, complaint dismissed).

4. Pugach v. Wilkins, Civil No. 11,-219 (W.D.N.Y. Dec. 11, 1964) (leave to proceed in forma pauperis denied) (civil rights suit alleging interference with appeal and access to courts, and fraudulent conviction for burglary; never prosecuted).

5. Pugach v. Riss, 64 Civ. 1880 (S.D.N.Y. Sept. 15, 1964) leave to appeal in forma pauperis, stay pending appeal, and transcription of record denied, Docket No. MR–114 (2d Cir. July 9, 1965) (petition to convene three-judge court to enjoin enforcement of Article 14 of N.Y. Correction Law, McKinney's Consol. Laws c. 43, § 512–b of N.Y.Penal Law McKinney's Consol.Laws c. 40, and § 102 of N.Y. Mental Hygiene Law, McKinney's Consol.Laws, c. 27, as unconstitutional; dismissed for failure to exhaust state remedies).

6. Pugach v. Brandenburg, (S.D.N.Y. Sept. 14, 1964 (leave to commence action in forma pauperis denied), leave to appeal in forma pauperis denied, Docket No. MR–126 (2d Cir. July 9, 1965) (civil rights suit alleging interference with access to courts; never commenced).

7. Pugach v. Larkin (S.D.N.Y. Sept. 15, 1964) (leave to commence action in forma pauperis denied), leave to appeal in forma pauperis denied, Docket No. MR–149 (2d Cir. July 9, 1965) (civil rights action to compel production of Comptroller's files; never commenced).

8. Pugach v. New York Post Corp., 64 Civ. 2632 (S.D.N.Y. Nov. 14, 1964) (libel suit alleging denial of fair trial because of libels printed; complaint dismissed for lack of jurisdiction).

9. Pugach v. Hearst Consol. Publications, Inc., 64 Civ. 2633 (S.D.N.Y. Nov. 14, 1964) (libel suit; complaint dismissed for lack of jurisdiction).

10. In re Application of Pugach v. Riss, 64 Civ. 3803 (S.D.N.Y. Dec. 4, 1964), rehearing denied, (S.D.N.Y. Jan. 12, 1965) (application to remove civil action from state to federal court; application denied because action not removable).

11. United States ex rel. Pugach v. Warden of Manhattan House of Detention for Men, 65 Civ. 3191 (S.D.N.Y. June 1, 1965) (denying application to file in forma pauperis), appointment of counsel and hearing denied, (S.D.N.Y. June 16, 1965), application to vacate order or issue certificate of probable cause and leave to appeal in forma pauperis denied, (S.D.N.Y. July 15, 1965), habeas corpus denied (S.D.N.Y. Nov. 26, 1965) (habeas petition alleging unlawful eavesdropping; unconstitionality of § 813–a of N.Y. Code of Crim.Pro.; petition denied as not properly filed in district).

12. Pugach v. Edelstein, Docket No. MR–352 (2d Cir. 1965) (motion for writ of mandamus alleging improper transfer of petition to another member of court; denied).

13. Pugach v. Ryan, Docket No. MR–105 (2d Cir. July 9, 1965) (motion for writ of mandamus to compel judge to sign show cause orders relating to injunctions pendente lite; denied).

14. In re Application of Pugach, Civil No. 11,612 (W.D.N.Y. Oct. 25, 1965), leave to appeal in forma pauperis denied, Docket No. MR–784 (2d Cir. April 11, 1966) (habeas petition alleging lack of probable cause to arrest petitioner; application denied as without factual foundation).

15. United States ex rel. Pugach v. Nenna, 66 Civ. 1774 (S.D.N.Y. June 27, 1966) (habeas petition alleging petitioner illegally detained without indictment or trial; petition denied because of failure to exhaust state remedies).

16. United States ex rel. Pugach v. Klein, 67 Civ. 365 (S.D.N.Y. April 12, 1967), reargument denied, (S.D.N.Y. June 20, 1967) (habeas petition alleging eavesdropping without probable cause, tacit admissions obtained by coercion, use of co-defendant's confession against him, and improper relief of petitioner's counsel prior to pre-sentencing sanity hearing; petition dismissed for failure to exhaust state remedies).

17. In re Application of Pugach v. Hanley, 67 Civ. 2078 (S.D.N.Y. May 26, 1967) (civil rights suit for order directing Clerk of Bronx County Supreme Court to elect one judgment of conviction from among other allegedly erroneous or illegal judgments; petition dismissed as improper review of pending proceedings and on ground that petition is frivolous).

18. United States ex rel. Pugach v. Mancusi, 67 Civ. 4018 (S.D.N.Y. Oct. 16, 1967), reargument denied, (S.D.N.Y. Nov. 7, 1967), reargument denied, (S.D.N.Y. Nov. 16, 1967) (habeas petition alleging trespassory eavesdropping without probable cause, illegal sentence in light of trial for misdemeanor only, use of statements coerced from petitioner by police agents, wilful use of perjured evidence, suppression of exculpatory matter, prejudicial press coverage; petition denied for failure to exhaust state remedies).

19. United States ex rel. Pugach v. Mancusi, 67 Civ. 4844 (S.D.N.Y. Dec. 8, 1967) leave to appeal in forma pauperis and certificate of probable cause denied, (S.D.N.Y. Jan. 19, 1968), certificate of probable cause and leave to appeal in forma pauperis granted, Docket No. MR–1785 (2d Cir. Oct. 7, 1968), rev'd, 411 F.2d 177 (2d Cir. 1969), motion for interrogatories and discovery denied, 67 Civ. 4844 (S.D.N.Y. Aug. 15, 1969), cert. denied, 396 U.S. 889, 90 S.Ct. 172, 24 L.Ed.2d 163 (1969) (habeas petition alleging illegal use of eavesdropping evidence, use of involuntary statements without separate hearing as to voluntariness, perjury and suppression of a witness' prior testimony; and failure to give notice of particulars underlying charge of burglary, maiming and assault; pending before the Court).

20. United States ex rel. Pugach v. Mancusi, 68 Civ. 1842 (S.D.N.Y. June 17, 1968) (habeas petition alleging failure to resentence petitioner, lack of notice of acts underlying burglary and maiming convictions; petition dismissed as frivolous and on ground that irregularities in commitment papers where sentences are clearly defined are not a ground for release).

21. United States ex rel. Pugach v. Mancusi, 68 Civ. 3948 (S.D.N.Y. Oct. 7, 1968) (leave to commence action in forma pauperis granted) (habeas petition alleging deprivation of effective assistance of counsel and deprivation of right to act pro se when counsel temporarily relieved; pending before the Court).

22. Pugach v. McGinnis, Civil No. 1969–120 (W.D.N.Y. April 3, 1969) (show cause order and leave to file application without prepayment of fees granted), action transferred to Southern District of New York, Civil No. 1968–199 (W.D.N.Y. Aug. 14, 1969) (civil rights action alleging contempt of resentencing order, interference with appeal and denial of access to attorney to consult about pending appeal; pending before the Court).

23. United States ex rel. Pugach v. Mancusi, Civil No. 1969–119 (W.D.N.Y. April 3, 1969) (habeas petition alleging interference with appeal and denial of access to attorney; petition dismissed for failure to exhaust state remedies).

24. United States ex rel. Pugach v. Mancusi, Civil No. 1968–199 (W.D.N.Y. April 29, 1969) (motion for interrogatories and discovery denied), disqualification motion granted, (W.D.N.Y. May 6, 1959), action transferred to Southern District of New York, (W.D.N.Y. Aug. 14, 1969) (habeas petition alleging unlawful use of co-defendant's confession and contempt of resentencing order; pending before the Court).

25. United States ex rel. Pugach v. Mancusi, 68 Civ. 2177 (S.D.N.Y. May 6, 1969) (habeas petition alleging trespassory eavesdropping, wilful use of perjured testimony and suppression of contradictory statements; pending before the Court).

26. United States ex rel. Pugach v. Mancusi, Civil No. 1969–311 (W.D.N.Y. Aug. 14, 1969) (leave to file without prepayment of fees granted and action transferred to Southern District of New

726

York) (habeas petition alleging that indictment is fraudulent, that trial court failed to charge as to acts underlying indictment, and that state officials defied resentencing order and prosecuted petitioner maliciously; pending before the Court).